JOHN L GANNON # 1975
Attorney at Law
2309 Mountain View Drive #174
Boise, Idaho 83706
208-433-0629
Attorney for Plaintiff
johngannon200@gmail.com

### IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| SUSAN CHEW; MARIANNE "MUFFY" DAVIS | ) ) | |
| | ) | CASE NO. |
| Plaintiffs | ) | |
| | ) | AFFIDAVIT OF SUSAN |
| v | ) | CHEW |
| | ) | |
| THE LEGISLATURE OF THE STATE OF IDAHO; SCOTT BEDKE in his capacity as ADMINISTRATOR OF THE HOUSE OF REPRESENTATIVES | ) ) ), ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

I am one of the Plaintiffs in this case. I have served as a Representative from District 17 since 2006 and I am a pharmacist by profession. I graduated from UC Berkeley School of Pharmacy in 1986 and I retired from being a fulltime practicing pharmacist in around 2000. As part of my training I learned and have understanding of many different medications and drugs that are used to treat people.

I have Type II Diabetes because of my background I understand, study and keep up to date on the condition of diabetes and I can give this Affidavit based upon my personal knowledge and experience.

Type I Diabetics produce no insulin and they are at risk of death. They have to take regular shots of insulin. In Type II Diabetes people the cells don't properly recognize the insulin

AFFIDAVIT OF SUSAN CHEW                                                                                   1

that is produced so glucose isn't absorbed like it should be and there is too much demand on the pancreas, which has the function of manufacturing insulin. So my diet is restricted and medications are proscribed to normalize the situation as much as possible.

I take metformin every day and Trulicity once a week which are a big help. I totally avoid carbohydrates and sugar. If I do eat them I can become dehydrated and exhausted so I am extremely careful and I have to immediately take care of myself if I feel a problem coming. I take care of myself by exercise, drinking more fluid and de-stressing. This allows me to do my job as a legislator and have an otherwise normal life. Sometimes though this life is interrupted. I get colds and flu's much more frequently than other people, and for example I got pancreatitis in 2020 no matter how careful I was, but it did resolve. I note that Trulicity can cause pancreatitis but I believe its benefit outweighs its risks.

Therefore, Covid-19 is a huge risk for me because my immunity system is weaker than other peoples because of the Type II Diabetes. My doctor has written the attached letter. I note that Covid-19 attacks cells and because the cells of diabetics are already weak, diabetics are at much higher risk of a dangerous consequence.

*I do not ask that the Legislature and public visitors address my condition by masking, distancing and following widely publicized guidelines. I know that some completely resist the idea and I am told there will be no direction from the Legislature that everyone comply. Since this is not going to happen, I am simply asking that if legislators and the public are not doing this, then I should be reasonably accommodated by remote voting and participation, and a safe office.*

The following is a picture of the arrangement of the House during the August Special

AFFIDAVIT OF SUSAN CHEW                                                                        2

Session.   It shows the disorderly group in the gallery with no safety measures and the failure of members to wear masks and to social distance.



There was no social distancing, masking or order enforced at the August special session The following picture shows the House Floor during the Organizational Session in December. A majority of legislators did not mask, and many did not social distance. In fact it is not possible to social distance when coming and going from the House Floor.



AFFIDAVIT OF SUSAN CHEW                                                                    3

It is impossible to avoid contacts with others in this group situation.  I touch door handles, elevator buttons, copiers, scanners, and many things that others touch too. We only have access to bathrooms used by many others.  Most restrooms are used by the public and only one or two are reserved by legislators.

It is impossible to avoid contact with other's breaths of air. I regularly wear masks but know that moisture from other's breath can contact facial skin and even get into eyes.

One of the biggest problems has been the failure to control a public group that is aggressive, ignores reasonable legislative order and engages in no steps to protect others from Covid 19.  During the Special Session in August I was to sit in the gallery, socially distanced and participate.  This was fine with me as an accommodation.  When I was approaching the Fourth Floor to begin the session on the first day, I received a call from Representative Rubel advising me not to come to the Fourth Floor until things were under control.  Apparently, I wasn't going to be able to socially distance.  When I arrived at the Third Floor (where the House chambers are) I observed a noisy crowd packed into the Fourth Floor House Gallery and some people wandering the hallways in an agitated way.   I was not a member of any active committees during this session, but I did see unruly crowds in the hallways and I was informed that work on the floor would be delayed because of some committees not being able to work.

I asked John Gannon to help me ask for a formal accommodation because I wasn't sure how to do it and I knew he had asked for an Attorney General Opinion.  On August 26, he wrote the accommodation request with me which I personally gave to the Speakers Office and a copy to the Human Rights Commission.  It is attached as <u>Exhibit 1</u>.  I was hopeful that the issues would be resolved and I would be able to participate at the legislature in a safe, and healthy way.

There was no progress except for the plexiglass option which most legislators didn't use,

AFFIDAVIT OF SUSAN CHEW                                                                          4

and I continued to ask what accommodation would happen and to ask for remote voting through my Minority Leader Ilana Rubel.

I was optimistic that there would be actions, but at the Organizational Session still nothing had happened.  At that time I asked for a plexiglass shield for the House Chambers which I hadn't asked before because I thought I was going to sit in the gallery socially distanced. That didn't happen in August because the crowd took over the gallery and the crowd was not controlled by anyone.  So since it wasn't happening in December, I decided to ask for plexiglass.

One reason I was optimistic as the December session approached  was that I understood, as did my fellow members, that the First Floor self contained offices would be chosen by seniority and I would definitely be within the first 5 members to be able to choose one.  These offices have doors and more than one access, which helps to reduce walking past the public and other members.  However, after a vote to adopt rules, I and others learned that tradition would be violated and Vice Chairman's would get the offices, and that changed so that only Majority Party members got them through seniority.  Neither I nor Representative Davis were able to have one, and we currently have cubicle offices in an area with 20 cubicles.  The cubicles have 7 foot high walls and are open air from the top of the wall to the ceiling.  There are no doors, the passageways narrow, and members and the public who are visiting members walk past. Sometimes passageways are congested with small groups of visitors.

AFFIDAVIT OF SUSAN CHEW                                                                    5



Cubicle Offices on the Garden Level

Thereafter, I understood there were discussions going on, but it became clear toward Christmas that nothing was going to change. I have no reason to think that unmasked and congested groups of people will not reappear. I have been informed that legislation to limit the Governors power and Health District power will be presented so I think it is very likely the crowds will attend.

Remote participation is a reasonable accommodation. I know that committees this summer had remote participation from the public and members. There are about 10 self contained offices, and we were told I would get one because of my seniority. That did not happen and therefore I formally asked for an accommodation.

Dated this 6th day of January, 2021

By_____
SUSAN CHEW

By_____
NOTARY PUBLIC FOR IDAHO
Residing at Boise, Idaho
My Comm Exp 11/01/2024

ANGELICA P. LOEFLER
COMMISSION #48545
NOTARY PUBLIC
STATE OF IDAHO

AFFIDAVIT OF SUSAN CHEW                                          6

**JOHN GANNON**
DISTRICT 17A
ADA COUNTY



HOME ADDRESS
1104 JOHNSON STREET
BOISE, IDAHO 83705
(208) 343-1608
EMAIL: jgannon@house.idaho.gov

# House of Representatives
# State of Idaho

Speaker Scott Bedke
House of Representatives
Statehouse
Boise, Idaho 83720

Idaho Human Rights Commission
317 Main Street
Boise, Idaho 83720
Via Personal Delivery

Re: Representative Sue Chew Request
For Reasonable Accommodation

Dear Speaker Bedke and Commission:

National and State and Local leaders, business, labor, healthcare experts and industry all have agreed about the serious threat posed by the coronavirus and emergencies have been declared. They also agree that those with existing respiratory conditions and diabetes are at much higher risk of very serious consequences if they acquire the disease.  I write on behalf of Representative Sue Chew who has diabetes.

A member has a right to participate and to vote free from exposure to the virus.  Unfortunately, there is no mask or social distancing requirement being enforced.  A small crowd of unruly people without masks or distancing make the situation even more hazardous. They even broke a door.  Representative Chew was elected by her district and she has a right to safely do her job.  That right is being trampled on – almost literally.

Attached is an opinion from the Idaho Attorney General and a recent Federal Court case from Louisiana. Both recognize that a reasonable accommodation is required for a public official who is vulnerable to the virus because of a disability.

Suggestions for an accommodation include offering high risk members a secluded room in the Capitol where they can participate electronically, or allowing members to participate from home via zoom. You have suggested appropriate seating in the gallery which might work.  But in fact, the entire House could participate electronically as Legislative Services indicates that the legislature already subscribes to a service that can provide this feature.  Representative Chew wants the House to complete its business, but it should only be completed if all members are able to participate in a free and safe way.  That is not happening.

No one has argued that reasonable accommodations aren't required for a legislator who must use a wheelchair.  Nor would anyone question accommodations for a representative who is hearing impaired or unable to speak.  So the issue in this matter is when there is an emergency that unusually threatens those with certain preexisting conditions, is an accommodation required in order to preserve a legislators right to participate and in order to comply with the ADA.

Representative Chew believes the answer is yes and therefore this formal request for immediate accommodation is submitted.  She requests that it be acted upon immediately.

Thank you for your consideration.

Sincerely,

John Gannon



**STATE OF IDAHO**
OFFICE OF THE ATTORNEY GENERAL
LAWRENCE G. WASDEN

August 13, 2020

TRANSMITTED VIA EMAIL

The Honorable John Gannon
Idaho House of Representatives
Idaho State Capitol
700 West Jefferson Street, Room EG63
Boise, Idaho 83702
jgannon@house.idaho.gov

Re:     Request for AG analysis

Dear Representative Gannon:

I am responding to your questions concerning the impact of the 2019 novel coronavirus (COVID-19) pandemic and the Americans with Disabilities Act. The application of the Americans With Disabilities Act (ADA) to the Idaho Legislature is uncertain. At the outset, it is difficult to determine whether the Idaho Legislature meets the definition of employer. Additionally, each legislator is independently elected, and does not have an identifiable employer. But there is also an argument that a legislator with a qualifying disability under the ADA may be able to seek an accommodation under other provisions of the ADA that apply to the general public. In the abstract, it is impossible to provide a legally certain answer because ADA inquiries are extremely fact intensive inquiries. Further, what constitutes a reasonable accommodation for one person may not be a reasonable accommodation for another. As a result, the determination of what constitutes a reasonable accommodation can only be made on a case-by-case basis that takes into account each requester's particular disability(ies). The best legal answer this office can offer is that it is prepared to assist the Idaho Legislature in evaluating any ADA requests for accommodation if asked.

**Application of The Americans With Disabilities Act Is Uncertain.**

  *The Legislature As An Employer Is Legally Uncertain.*

Representative John Gannon
August 13, 2020
Page 2

The primary question under the ADA is whether elected legislators are employees, and if they are employees, who is their employer? Employment protections are contained in Title I. The Equal Employment Opportunity Commission (EEOC) authors a technical guide concerning enforcement of the ADA. With regard to elected officials, the technical guide takes the position that elected officials are likely considered employees under the ADA. This conclusion is based on the fact that both Title VII and the ADEA (Age Discrimination in Employment Act) specifically exempt elected officials from the definition of employee, while the ADA does not exempt them. But this conclusion is legally uncertain.

Resolution of this question is more difficult because, if the elected House members are employees, then the question is; who is their employer? To implement the changes that you propose (requiring masks or remote participation) would require a change in existing House rules. But if one considers the House their employer, the House may not meet the requirements of an employer ("a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or proceeding calendar year"). 42 U.S.C. § 12111(5). A typical legislative session lasts approximately 80 days, which using the ADA definition is approximately 11 weeks of work. Including the sporadic out of session work does not equate to "each working day in each of 20 or more calendar weeks." It is likely that the House is not an employer.

This analysis is complicated based on the definitions because House members are each distinct elected officials. There is no supervisor, although the House uses a Speaker, the Speaker's authority exists through the acquiescence of the House. Similarly, the Speaker does not pay members, and could not otherwise be considered their employer.

If a determination were made that legislators are employees, then the employer (assuming one could be identified) is required to engage in an interactive process to determine what reasonable accommodations can be made to allow them to perform the essential functions of their jobs. An employer is only entitled to deny a reasonable accommodation if it's an undue hardship. The undue hardship analysis is complex and difficult to establish in the abstract and in actual application. The interactive process typically involves a discussion with the employee to determine what is being requested, and usually involves seeking further information from the employee's medical provider if the employer wishes to verify or further understand the medical condition at issue and obtain input from the medical provider on what reasonable accommodations would assist the employee in performing the essential functions of their job. The employer then typically has an internal meeting to determine what it can provide and whether the requested accommodations are reasonable or constitute an undue hardship. The employee is not entitled to the specific accommodation requested if the employer can identify an equally (or more) effective accommodation that allows the employee to perform the essential functions of the position. Failure to engage in the interactive process is itself a violation of the ADA in the Ninth Circuit and can subject an employer to a damage claim, as well as injunctive relief.

Representative John Gannon
August 13, 2020
Page 3

However, to qualify for Title I protections, an individual must have an ADA-qualifying disability. In the context of COVID-19, that could be a variety of things – either physical conditions that make the individuals at high risk, or anxiety/depression related to COVID-19. Different physical or mental health conditions may merit different reasonable accommodations. If the person does not have a qualifying disability, they may have other remedies they can request but they are not entitled to a reasonable accommodation under the ADA. It should also be noted, however, that with the 2009 amendments to the ADA Congress made clear that employers should not spend an undue amount of time on determining whether someone has a "qualifying disability" but instead should focus on the ability to grant the requested accommodation(s).

*ADA – Title II Access to Public Services.*

Although Title I of the ADA may be uncertain, Title II of the ADA, which pertains to the public's ability to access public services appears applicable. The EEOC takes the position in the above-referenced technical guide that even if elected officials are not considered employees, they would be entitled to request accommodations under Title II of the ADA.

Title II provides in 42 USCA § 12132:

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity.

The Ninth Circuit held that facially neutral policies may violate Title II when such policies unduly burden disabled persons, even when the policies are consistently enforced. *See* McGary v. City of Portland, 386 F.3d 1259, 1265 (9th Cir. 2004). Examples given by the Court in McGary of facially neutral policies that unduly burdened disabled individuals were the PGA banning the use of golf carts in certain tournaments (unduly burdening golfers with mobility impairments); and Hawaii's policy of quarantining all incoming animals, including guide dogs, for 120 days (unduly burdening the visually impaired).

In McGary, a man with AIDS sued the City of Portland after it cited him for nuisance abatement because he failed to clean up debris in his yard within 15 days after City officials notified him to do so. He had been in the hospital with meningitis and requested the City grant him additional time to clean up his yard, but the City denied his request. The Plaintiff raised several claims against the City, including a failure to reasonably accommodate him in violation of Title II of the ADA. The City argued he could not establish discrimination because the Plaintiff could not establish he was treated any differently than an able-bodied person, i.e. the City treated the disabled and able-bodied equally because it refused to grant anyone an extension. The Ninth Circuit did not find this a viable defense, and concluded the Plaintiff need not establish he was treated differently in order to establish a claim for failure to reasonably accommodate. The Ninth Circuit concluded that modifications to municipal code enforcement fell under Title II's provisions.

Representative John Gannon
August 13, 2020
Page 4

The U.S. Department of Justice (DOJ) administers Title II of the ADA. With regard to Title II accommodations, the DOJ's ADA Update: A Primer for State and Local Governments, states that the ADA allows and may require different treatment of a person with disabilities in situations where such treatment is necessary in order for a person with a disability to participate in a civic activity. As you noted in your email, a specific example given in the DOJ guidance is if a city council member has a disability that prevents her from attending city council meetings in person, then delivering papers to her home and allowing her to participate by telephone or videoconferencing would enable her to carry out her duties. The DOJ guide goes on to state that only "reasonable" modifications are required. Any modification that would result in a "fundamental alteration", meaning a change in the essential nature of the entity's programs or services, is not required. As previously noted, reasonable accommodation determinations must take into account the individual requester's situation. What constitutes a reasonable accommodation for one disability, may not constitute a reasonable accommodation for someone with a different disability.

> *The Respective Chamber Should Carefully Consider Requests for Accommodation Under the ADA.*

With regard to both Title I and Title II of the ADA, if legislators provide evidence they have either a physical or mental disability and that their medical professionals advise them they cannot safely attend in person as currently planned because of that disability, then the applicable chamber should examine the requested accommodations and determine whether the requested accommodation or any equally effective alternative accommodations would enable the legislator to perform the essential functions of her position (for purposes of Title I) or enable her to participate in the services, programs, or activities of the Legislature (for purposes of Title II). This analysis will necessarily include consideration of the individual's disabilities and tailoring of the reasonable accommodation to the individual's limitations. Under Title I, the requested accommodation can be denied if it is unreasonable or would constitute an undue hardship. Under Title II the Chamber only has to implement reasonable modifications. The question of whether a requested accommodation constitutes a "fundamental alteration" under Title II is going to be a fact-intensive inquiry. A claim brought under either section would likely be fact-intensive and therefore likely difficult to prevail upon in summary judgment.

**Conclusion**

Recognizing that this office cannot offer a definitive legal answer at this time with regard to the ADA questions, this office will be available should the need arise to evaluate a request for accommodation, whether it constitutes an undue hardship, its reasonableness and other legal issues at the request of the Legislature. Specifically, the determination of whether ZOOM is an acceptable alternative will depend on the numerous factors discussed within this letter.

Representative John Gannon
August 13, 2020
Page 5

I hope that you find this analysis helpful.

Sincerely,

BRIAN KANE
Assistant Chief Deputy

BK:kw



casetext

Help    Sign In    Sign Up

Search all cases and statutes...                                    JX

Opinion    Case details

From Casetext: Smarter Legal Research

# Silver v. City of Alexandria

UNITED STATES DISTRICT COURT WESTERN DISTRICT OF LOUISIANA ALEXANDRIA

DIVISION

Jul 6, 2020

CASE NO. 1:20-CV-00698 (W.D. La. Jul. 6, 2020)    Copy Citation

&#x1F847; Download        &#x1F6A9; Treatment

CASE NO. 1:20-CV-00698

07-06-2020

HARRY B SILVER v. CITY OF ALEXANDRIA ET AL



**See why 5,000+ firms switched to Casetext. Great coverage for only $65/month.**

See Coverage >

JUDGE DRELL

# MAGISTRATE JUDGE PEREZ-MONTES

### RULING AND ORDER

Before the court is a motion for preliminary injunction (Doc. 7) filed by Harry B. Silver ("Silver") an Alexandria City Council member who represents District Four of Alexandria, Louisiana. Mr. Silver is 98 years old.

 casetext

Help   Sign In   Sign Up

Search all cases and statutes...                    JX

**Opinion**   Case details

Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA").

The extent of Mr. Silver's disability became apparent this year when the world was introduced to COVID-19. It is well known that the elderly and/or those who suffer from underlying medical conditions are particularly susceptible to contracting COVID-19 and succumbing to the virus. Mr. Silver is no exception. His physicians have directed and continue to direct him to avoid contact with the public.

Prior to Louisiana's first reported positive case of COVID-19, Mr. Silver fell and broke his elbow. Accordingly, on February 13, 2020, Mr. Silver contacted Ms. Donna Jones, Executive Secretary of the Alexandria City Council, and requested that he be able to attend the February 18, 2020, City Council meeting by phone. The fall and its consequences only affected his February

2   ·2 meeting attendance. March and later are subject to this action. Mr. Silver did not receive a response to that February request nor his repeated requests to attend meetings on March 3, 7, 12, April 14, and 28.

On May 7, 2020, Mr. Silver wrote to City Attorney for the City of Alexandria, Mr. David Williams and explained: "despite repeatedly informing the City that I am currently medically unable to physically attend the meetings of the Council, the City has failed to make its activities available to me so that I can continue to robustly represent and engage on behalf of my constituents." (Doc. 7-3) Mr. Williams wrote to City Council President, Mr. Jules R. Green, "strongly recommending" Mr. Silver be allowed to attend meetings by telephone as "the Americans with Disabilities Act could usurp state law, especially during the national public health emergency." (Doc. 7-4). Nevertheless, Mr. Silver was denied telephonic attendance. (Doc. 7-5). The only response from Mr. Green, was a snarky one sent to Mr. Williams, to wit:

casetext

Help    Sign In    Sign Up

Search all cases and statutes...                                    JX

Opinion    Case details

Department Proclamation Number 59 JBE 20200 Section 2: Public
employees and State Offices Item C.

Please refer to the United States District Court Western District of
Washington at Seattle Item b: Clackamas v. Gastroenterology
Associates., P.C. v. Wells, 538 U.S. 440, 445, 448 (2003). See the
attached references.

Attorney Williams, Mr. Silver has missed eight (8) council
meetings, February 4, 18, March 3, 7, and 12, April 14, 28 and May 12.
It may be in order for the unexcused meetings that the salaries are
returned to the City of Alexandria.

3    (Doc. 7-5). *3

On June 3, 2020, Mr. Silver filed the instant lawsuit against the City of
Alexandria and Mr. Jules R. Green, in his official capacity.[1] Mr. Silver sought
declaratory relief, a permanent injunction requiring Defendants to comply
with the requirements of the ADA/RA and to provide the appropriate
accommodations and to reasonably accommodate Mr. Silver and others with
disabilities; judgment against the City of Alexandria for his asserted causes
of action, nominal and compensatory damages under the ADA and
Rehabilitation Act; costs and fees; and an order retaining jurisdiction to
ensure enforcement of any injunctive relief. (Doc. 1).

   [1]   Plaintiff's Title II ADA claims were brought solely against Mr. Green
         pursuant to the doctrine of Ex parte Young, 209 U.S. 123 (1908).

On June 23, 2020, following service of the complaint (Docs. 5 and 6) but
prior to the filing of a response by either Defendant, Mr. Silver filed his
motion for preliminary injunction.[2] (Doc. 7). On June 26, 2020, this court
set a hearing via Zoom video conference to be held July 2, 2020. (Doc. 9).
The Defendants filed memoranda in opposition. (Docs. 15 and 16).

Search all cases and statutes...                              JX

**Opinion    Case details**

the public, including the media, family members, residents of the City of
Alexandria, and an Assistant Attorney General with the State of Louisiana.
During the hearing, counsel for Mr. Silver reiterated the request for a
reasonable accommodation that would allow Mr. Silver to attend City
Council meetings. Counsel acknowledged that the initial request was for
telephone participation, but video conferencing would be ideal. Regardless,
Mr. Silver would agree to whichever means was preferable to the City
Council as least intrusive. Council for the City of Alexandria argued that any
remote access to meetings, be it by telephone *4 or video conference was
unreasonable because Louisiana law required in person attendance. These
concerns were echoed by counsel for Mr. Green. Additionally, counsel for
Mr. Green questioned whether the ADA was even applicable to the matter as
Mr. Silver was an elected official and not an employee of the City.

4

> 3   Zoom, and other types of video conferences, afford the ability for projection
>      of the participants' faces, and verbiage in real time. They are easily enabled
>      to allow for public participation both by telephone and video, at the option
>      of the party acting as host for the conference.

I. Preliminary Injunction

Mr. Silver's entitlement to a preliminary injunction depends upon showing:
(1) a substantial likelihood of success on the merits; (2) substantial threat of
irreparable injury if injunction is not granted; (3) that threatened injury to
movant outweighs threatened injury to nonmovant; and (4) that grant of
preliminary injunction will not disserve public interest. Fed.R.Civ.P. 65;
Clark v. Pritchard, 812 F.2d 991, 993 (5th Cir.1987). Mr. Silver bears the
cumulative burden of establishing all four elements. Id.; Mississippi Power
&Light v. United Gas Pipeline, 760 F.2d 621 (5th Cir. 1985).

A. Likelihood of Success on the Merits

Mr. Silver's claims are brought pursuant to the Title II of the ADA[4] and §504
of the Rehabilitation Act. 42 U.S.C. §12131, *et seq*. and 29 U.S.C. §794, *et seq*.



Search all cases and statutes...                                    JX

**Opinion**    **Case details**

the discriminatory action, not merely a motivating factor. <u>Id.</u>; <u>Soledad v. U.S.</u>
<u>Dept. Of Treasury</u>, 304 F.3d 500, 505 (5th Cir.2002). However, the Fifth
Circuit has deemed the different causation requirements as immaterial
because both the ADA and Rehabilitation Act "impose upon public entities
an affirmative obligation to make reasonable accommodations for disabled
individuals." <u>Bennett-Nelson</u>, 431 F.3d at 454-55 (internal citations omitted;
further citation *infra*); <u>Tennessee v. Lane</u>, 541 U.S. 509, 533 (2004) (Finding
Title II imposes "an affirmative obligation to accommodate persons with
disabilities).

4   Title II is unlike Title I of the ADA. While Title I addresses discrimination in
the context of employment, Title II addresses prohibitions against
discrimination in the context of public services.

5   Under Title II, "no qualified individual with a disability shall, by reason of
such disability, be excluded from participation in or be denied the benefits
of the services, programs, or activities of a public entity, or be subjected to
discrimination by any such entity. 42 U.S.C.§12132. A "public entity" includes
"any state or local government" or "any department, agency, special purpose
district, or other instrumentality of a State or States or local government"
and a "qualified individual with a disability means an individual with a
disability who, with or without reasonable modifications to rules, policies,
or practices, the removal of architectural communication, or transportation
barriers, or provision of auxiliary aids and services, meets the essential
eligibility requirements for the receipt of services or the participation in
programs or activities provided by a public entity." 42 U.S.C. §12131.

Under Section 504 of the Rehabilitation Act, "[n]o otherwise qualified
individual with a disability in the United States ... shall, solely by reason of
her or his disability, be excluded from the participation in, be denied the
benefits of, or be subjected to discrimination under any program or activity
receiving Federal financial assistance or under any program or activity
conducted by any Executive agency or by the United States Postal Service.
29 U.S.C. §794.



Search all cases and statutes...                                              JX

Opinion    Case details

public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." Melton v. Dallas Area Rapid Transit, 391 F.3d 669, 671-72 (5th Cir. 2004). "In addition to their respective prohibitions of disability-based discrimination, both the ADA and the Rehabilitation Act impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." Bennett-Nelson v. La. Bd. of Regents, 431 F.3d 448, 454 (5th Cir. 2005); see also Jin Choi v. Univ. of Tex. Health Sci. Ctr. at San Antonio, 633 Fed. App'x 214, 215 (5th Cir. 2015) (adapting the failure-to-accommodate standard from Title I to Title II); Ball v. LeBlanc, 792 F.3d 584, 596 n.9 (5th Cir. 2015) (same). For this type of claim, a plaintiff must show that the entity knew of the disability and its

6    consequential limitations, either because •6 the plaintiff requested an accommodation or because the nature of the limitation was open and obvious. Windham v. Harris City, Texas, 875 F.3d 229, 236-37 (5th Cir.2017) (citing Taylor v. Principal Fin. Grp., Inc., 93 F.3d 155, 164 (5th Cir. 1996)). A plaintiff's requested accommodation must also be "reasonable," meaning that it does not impose undue financial or administrative burdens or "fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7); see also Frame v. City of Arlington, 657 F.3d 215, 232 (5th Cir. 2011) (en banc).

i. Qualified Individual with a Disability

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual...." 42 U.S.C §12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeking, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. §12102(2). The medical evidence establishes that Mr. Silver is disabled by virtue of the fact his cardiovascular system is so compromised a pacemaker is required to regulate it.

casetext

Help    Sign In    Sign Up

Search all cases and statutes...                                    JX

Opinion   Case details

accommodate claim, a plaintiff must prove: (1) he is a qualified individual
with a disability; (2) the disability and its consequential limitations were
known by the covered entity; and (3) the entity failed to make reasonable
accommodations." Ball v. LeBlanc, 792 F.3d 584, 596 n.9 (5th Cir. 2015).
Plaintiffs ordinarily can satisfy the knowledge element by showing that they
identified their disabilities as well as the resulting limitations to a public
entity or its employees and requested an accommodation in direct and
specific terms. Windham, 875 F.3d at 237. *7

7

It is our considered opinion that Mr. Silver's position in favor of injunctive
relief is well taken, if limited to some degree. We find easily that he has a
qualifying disability. That results, in substantial part, from the existence of
the COVID-19 pandemic in our nation, and the existence of his obvious co-
morbidities. Defendants argue that he is not entitled to claim those
disabilities BECAUSE they are only COVID-related. In other words, because
his disabilities are only situational, he cannot avail himself of the
accommodations provided for by the ADA/RA. Such an argument fails,
however, because of the simple and logical explanation of things the way
they are. Neither the ADA nor the Rehabilitation Act contain any language to
limit application to certain environmental or health-related situations. It
makes complete sense to say that any application of these laws to these facts
must be based upon a factual analysis that considers the totality of Mr.
Silver's health circumstances in conjunction with one's social
circumstances. Call it a totality of the circumstances evaluation. The
determination of a qualifying disability in this case cannot be looked at in a
vacuum. At the hearing, upon questions from the court, even counsel for the
City conceded that the advent of the pandemic has turned virtually
everything we do on its head. Generally, the pandemic is the unprovided-for
case. In sum, consideration of Mr. Silver's documented serious underlying
medical situation, in light of the pandemic's existence, is the proper way to
make the disability determination here. It is not the reverse, as the defense
suggests.

Search all cases and statutes...                                    JX

Opinion    Case details

8

extreme risk of attending in person during the pandemic. His requests to
the counsel clerk were ignored. The advice given to Council President (Mr.
Green) by City Attorney Mr. Williams regarded the *8 same medical
conditions, possible accommodation, and advice to allow Mr. Silver to
participate remotely, was also ignored. The Defendants suggests, in
argument, that perhaps there was some other reason why Mr. Silver was not
allowed to participate, but not before this injunction motion was filed. Any
suggestion of another reason for denial (the Open Meetings Law in
Louisiana) was also not offered. Even worse is to suggest is that, if the issue
was not Mr. Silver's health issue being THE conversation it could have been
political retribution or something else. The record does not support such
ruminations. We thus find that the sole cause of the Defendant's refusal to
allow his virtual participation was Mr. Silver's serious medical conditions,
his physician's advice to remain isolated, and the existence of the COVID-19
pandemic. No other conclusion fits the established facts here.

Raised for the first time by Defendants in this preliminary injunction
proceeding, the existence of Louisiana's Open Meetings Law, La.R.S. 42:11, *et
seq.*, is posited as a basis to deny the preliminary injunction. That law, in
relevant part, provides:

Meetings of public bodies to be open to the public

A. Every meeting of any public body shall be open to the public....

B. Each public body shall be prohibited from utilizing any manner
of proxy voting procedure, secret balloting, or any other means to
circumvent the intent of this Chapter.

C. All votes made by members of a public body shall be via voice
and shall be recorded in the minutes, journal, or other official,
written proceedings of the body which shall be a public document.

Search all cases and statutes...                                    JX

**Opinion    Case details**

Defendants argue that the allowing of Mr. Silver's participation in council
meetings by virtual means would violate the letter and spirit of state law.
Here we are mindful that state law makes no provision for accommodation
under the ADA/RA. Our analysis reveals that application of the ADA/RA in
this circumstance would therefore have to be the result of preeminence of
federal law over state law to the contrary. Counsel ably argues that the Open
Meetings Law has the intent behind them to allow for full public
participation in affairs of state at various levels... in other words, to prevent
improper secret deals to be made by politicians. To that end, it promotes
"sunshine." It is true that virtual participation by an individual council
member is not exactly the same as participation by physical presence.
Indeed, counsel for the defense urges that if we grant the injunctive relief
sought here, we would violate 40 years of state precedent via Louisiana
Attorney General opinions about telephonic participation by members. See
La. Atty. Gen. Op. Nos. 78-1017, 14-0011, 13-0075, 02-0106, 99-385, 99-0034,
93-137, 92-166, 88-238. What is omitted from argument of counsel is the rise
of significant new technologies such as Zoom and others that allow for
public participation at meetings either in person or virtually, with members
of the public being able to see and hear entire meeting contents by real time
video, the full opportunity to ask questions and to participate fully. Indeed,
the hearing on this preliminary injunction had actual video participation by
members of the public, the media, and others. News stories hit the wire very
shortly after the hearing attesting to its ease of use.

Significantly, also in a post hearing supplemental brief, Mr. Silver's counsel
pointed out that Louisiana has now passed legislation that empower public
bodies, like the City Council to hold meetings virtually, to wit:

> During a gubernatorially declared state of emergency pursuant to
> R.S. 29:724, *et seq.*, or a gubernatorially declared state of public
> health emergency pursuant to R.S. 29:766, *et seq.*, and as necessary

casetext

Help   Sign In   Sign Up

Search all cases and statutes...                                    JX

Opinion    Case details

participate in the debate and vote if the member participates
remotely by telephone, teleconference, or other electronic means.

. . .

Not withstanding any other provisions of this Chapter to the
contrary, a public body may conduct and its member may attend
and participate in a meeting via electronic means provided the
following:

The presiding officer of the public body certifies on the notice of
the meeting that the agenda of the meeting is limited to ...Matters
that are critical to the continuation of the business of the public
body and that are not able to be postponed to a meeting held in
accordance with other provisions of this Chapter due to a legal
requirement or other deadline that cannot be postponed or delayed
by the public body.

Act No. 302 of the 2020 Regular Session. While the new language is not
mandatory to bodies like the Council, it authorizes during the pandemic,
that things like the request made my Mr. Silver are not to be taken at odds
with the Open Meetings Laws. As the Governor has wisely recognized, and
the Legislature has affirmed, these times of the COVID-19 pandemic are
extraordinary in their impact. These changes also recognize the need to be
reliant upon all the tools we have, and especially the technology, so long as
we continue to respect the need for fair and open governance. We thus find
no substantial negative impact on the operation of city government by the
granting of injunctive relief. Compliance will only require minimal logistical
setup to effect and preserve the open meetings aspect of Louisiana's laws.

iii. Discrimination Based on Disability

casetext

Help   Sign In   Sign Up

Search all cases and statutes...                    JX

Opinion   Case details

financial or administrative burden" or required "fundamental alteration in
the nature of the program." Id. Mr. Silver seeks a reasonable accommodation
11   to which he is entitled by virtue *11 of his disability. He was summarily
denied the accommodation despite the Defendants' duty to provide the
same. The request was reasonable in that it simply allowed for virtual
appearance and allowing the same by means such as video conferencing
would not alter the nature of City Council meetings.

B. Irreparable Injury

Mr. Silver has demonstrated irreparable injury will continue if the injunction
is not granted. Without injunctive relief, Mr. Silver has no means of
attending City Council meetings in any capacity. Such is a direct violation of
Title II of the ADA and the Rehabilitation Act.

C. Whether Defendants Will Suffer Injury

Defendants assertion that they will suffer an injury by having to violate the
law is without moment. As explained, virtual attendance by Mr. Silver is
nearly identical to physical presence at the meetings; thus, the spirit of the
Open Meetings Law is not violated. In light of Louisiana's recent law, in fact,
it is supported.

D. Public Interest

Finally, virtual attendance at meetings benefits the public interests. Not
only is Mr. Silver able to represent his constituents but members of the
public who may be facing their own COVID-related obstacles may attend
meetings of the Council.

II. Conclusion

"Crafting a preliminary injunction is an exercise of discretion and
judgment." Trump v. Int'l Refugee Assistance Project, — U.S. —, 137 S. Ct.

≋ casetext                                    Help   Sign In   Sign Up

Search all cases and statutes...                                    JX

Opinion   Case details

~~We limit the relief granted here to the time period covered by the Louisiana~~
Governor's emergency orders on the COVID-19 virus. Any further injunctive
request will require a new application. It is therefore

ORDERED, ADJUDGED and DECREED that a preliminary injunction is
hereby issued addressed to Defendants, the City of Alexandria and Jules R.
Green, its Council President, to allow Mr. Harry Silver to participate and
vote in all regular or special Alexandria City Council meetings virtually and
from interfering with such participation by Mr. Silver. The accommodation
ordered is that Defendants shall make all necessary arrangements that will
allow Mr. Silver to participate and vote and will allow the public access to
such meetings to otherwise comply with the Louisiana Open Meetings Law.

THUS DONE AND SIGNED this 6th day of July 2020, at Alexandria,
Louisiana.

/s/ _____

DEE D. DRELL, JUDGE

UNITED STATES DISTRICT COURT

Coverage

SmartCite

Public records search

Partnerships and Resources

Law school access



**FAMILY MEDICINE HEALTH CENTER**

325 W IDAHO ST
BOISE ID 83702-6040
208-514-2525

11/30/2020

Re: Susan B Chew

1304 S Lincoln Ave

Boise ID 83706

To Whom it may concern,

I currently serve at the Primary Care Provider for Susan "Sue" Chew at the Family Medicine Health Center. She has multiple medication conditions that put her at risk for complications from the novel coronavirus, COVID-19, if she were to contract it including the need for extended hospitalization in the intensive care unit and potentially even death. She, and I, would greatly appreciate if the legislature would consider this in it's planning around trainings and meetings throughout the legislative session by encouraging public health measures that mitigate viral spread. These include, but are not limited to, social distancing, consistent face masking (that cover mouth and nose), and frequent hand washing. If these measures are adhered to then she will be safe and be able to participate throughout the legislative session. Further guidelines can be found at www.cdc.gov.

Please do not hesitate to contact me if you have further questions or concerns.

Sincerely,
Jennifer Cook, MD

# SUSAN B CHEW

**1304 Lincoln Avenue**
**Boise, Idaho 83706**
**schew@house.idaho.gov**

Scott Bedke
Speaker of the House
Via Email: sbedke@house.idaho.gov

Dear Mr. Speaker:

Yesterday my attorney provided a copy to you of my proposed Complaint and I so appreciate your review and consideration of the requests therein.

In order to be a little more precise regarding the accommodation I am requesting, I am providing a little more specificity to my request.

As you are aware, Title II of the Americans with Disabilities Act (ADA) prohibit discrimination against people with disabilities in State and local government services, programs and activities. Any state or local government agency is covered by the ADA because it is a program offered by a State or local government regardless of whether it receives federal grants or other federal funds. Under Title II of the ADA, a public entity must reasonably modify its policies, practices, or procedures to avoid discrimination, unless the entity can demonstrate that the modification would fundamentally alter the nature of the service, program or activity.

The ADA covers a wide range of individuals with disabilities. Under this law, an individual is considered to have a "disability" if he or she has a physical or mental impairment that substantially limits one or more major life activities, has a record of such impairment, or is regarded as having such an impairment. I believe I qualify under this definition.

Pursuant to Title II of the ADA, 28 CFR 35.130(b)(7) which requires public entities to make reasonable modifications in their policies, practices or procedures, I, as a person with a disability and I need to request a modification of your policy of not allowing remote virtual voting and participation in all proceedings on the House Floor and in Committees and in the assignment of office space.

The modification I request is:

1. Appearing, participating (debating) and voting by a virtual remote method. just as other legislatures are allowing members to do.

2. I further request that I be provided with an enclosed office such as one of the legislative offices on the First Floor near an exit/entrance.