JOHN L GANNON # 1975
Attorney at Law
2309 Mountain View Drive #174
Boise, Idaho 83706
208-433-0629
Attorney for Plaintiffs
johngannon200@gmail.com

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| SUSAN CHEW; MARIANNE "MUFFY" DAVIS | ) | |
| | ) | CASE NO. |
| Plaintiffs | ) | |
| | ) | |
| v | ) | MEMORANDUM IN SUPPORT |
| | ) | OF TEMPORARY RESTRAINING |
| THE LEGISLATURE OF THE STATE OF | ) | ORDER AND PRELIMINARY |
| IDAHO; SCOTT BEDKE in his capacity as | ) | INJUNCTION |
| ADMINISTRATOR OF THE | ) | |
| HOUSE OF REPRESENTATIVES | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

INTRODUCTION

Plaintiffs have filed this suit under the Rehabilitation Act of 1973 and Title II of the

Americans with Disabilities Act.  Plaintiff Chew has a disability related to Type II diabetes and

hypertension.   Plaintiff Davis has a disability in that her mobility is restricted because she is a

paraplegic and her lung capacity is restricted because of diaphragm damage.  Because of these

disabilities they are both at greater risk of covid-19 serious harm and even death.  In addition

Plaintiff Davis has mobility issues because she is a paraplegic.  Because of her condition she was

trapped in a House Committee when there was chaos during the Special Session in August.  The

disruption and chaos at our Nation's Capitol increases concern for her safety, especially when

the Idaho Capitol has absolutely no control over who enters.  Therefore, since the Legislature

does not follow safe practices to require the public and members to reasonably use protections from Covid – 19, and to protect the safety of all who are in the Capitol, the Plaintiffs ask for remote participation and voting and that they be provided a self- contained office.

After many complaints and communications, with little or no direct response, the Plaintiffs are left with the need to pursue this legal remedy, something they did not wish to do, but they have no choice.

I

THE FEDERAL COURT HAS SUBJECT MATTER JURISDICTION

The Ninth Circuit said in *Douglas v. Cal. Dep't of Youth Auth.,* 271 F.3d 812, 820, *as amended,* 271 F.3d 910 (9th Cir. 2001)*, and reh'g en banc denied,* 285 F.3d 1226 (9th Cir. 2002)):

> States are protected by the Eleventh Amendment from suits brought by citizens in federal court. Hans v. Louisiana, 134 U.S. 1, 15 (1890); *College Sav. Bank v. Florida Prepaid Post-secondary Educ. Expense Bd.*, 527 U.S. 666, 669 (1999). There are only three exceptions to this general rule. First, a state may waive its Eleventh Amendment defense. *College Sav. Bank*, 527 U.S. at 670, (citing *Clark v. Barnard*, 108 U.S. 436, 447-48 (1883)). Second, Congress may abrogate the States' sovereign immunity by acting pursuant to a grant of constitutional authority. *Kimel v. Florida Board of Regents*, 528 U.S. 62, 80 (2000). Third, under the *Ex parte Young* doctrine, the Eleventh Amendment does not bar a "suit against a state official when that suit seeks . . . prospective injunctive relief." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73 (1996).

This Court has jurisdiction over the claims of Plaintiffs Davis and Chew pursuant to all three exceptions.  (Note that a part of  *Douglas* was overruled by the United States Supreme Court but this part of the case was not.  *Douglas* has been cited many times for this proposition including several times in 2020 by District Courts)

A.

## THE IDAHO LEGISLATURE WAIVED SOVEREIGN IMMUNITY WHEN IT ACCEPTED FEDERAL FUNDS

The record reflects that federal CARES ACT money has been used and accepted by the Idaho Legislature. (Affidavit Wintrow). The Governor of Idaho created a Coronavirus FinancialAdvisory Committee (Hereafter "CFAC" or "the Committee") to advise him with regard to distribution and management of this money. The Committee's directive says at its website:

> The Governor's Coronavirus Financial Advisory Committee will make recommendations to ensure the federal funds are appropriately prioritized and efficiently distributed across state, local and tribal governments. It also will play a critical oversight role to ensure the federal funds are used judiciously and appropriately.

When a government entity accepts federal money, the Rehabilitation Act of 1973 becomes applicable and the recipient must comply with the Act, particularly Section 504, in all of its activities. *Fleming v. Yuma Regional Medical Center*, 587 F.3d 938 at 942 (9th Cir. 2009); and see *Flynn v. Distinctive Home*, 812 F.2d. 422, 425 (5th Cir 2016). *Fleming* described the Act's application as follows:

> First, the scope of the Rehabilitation Act is broader than the ADA. The Rehabilitation Act covers any "otherwise qualified individual," who has been, "excluded from the participation in, or denied the benefits of, or ... subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The Rehabilitation Act covers any program receiving federal funds. The Act carefully defines "program or activity" as "*all* of the operations of 'state instrumentalities', colleges and universities, local education agencies, and "an entire corporation, partnership, or other private organization, or an entire sole proprietorship." 29 U.S.C. § 794(b) (emphasis added). This language has led us to interpret " program or activity broadly." *Sharer v. Oregon,* 581 F.3d 1176, 1178 (9th Cir.2009) (quoting *Haybarger v. Lawrence County Adult Prob. & Parole,* 551 F.3d 193, 200 (3d Cir.2008) (internal quotation marks omitted)). Thus,

the Rehabilitation Act covers "all of the operations" of covered entities, not only those related to employment.

*Fleming* held that an independent contractor working for an entity that received federal funds is covered by the Rehabilitation Act, concluding that "the Rehabilitation Act covers 'all of the operations' of covered entities, not only those related to employment." *Fleming*, 587 F.3d at 942.

Similarly The Ninth Circuit has said in *Phiffer v. Columbia River Correctional Inst.*, 384 F.3d 791(9th Cir. 2004):

> Likewise, our precedent is clear that the State waived its Eleventh Amendment immunity under Section 504 of the Rehabilitation Act by accepting federal funds. *See, e.g., Douglas v. Cal. Dep't of Youth Auth.,* 271 F.3d 812, 820, *as amended,* 271 F.3d 910 (9th Cir. 2001), *and reh'g en banc denied,* 285 F.3d 1226 (9th Cir. 2002). Again, the State points to "intervening Supreme Court precedent," this time *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board,* 527 U.S. 666, 675-76, 119 S.Ct. 2219, 144 L.Ed.2.

*Phiffer*, 384 F.3d at 793.

In the case brought by Plaintiffs Chew and Davis there is even more compelling evidence that the legislature is covered by the Rehabilitation Act. The minutes of the July 15, 2020 meeting as verified in the Affidavit of Melissa Wintrow state:

> The purpose of this CFAC meeting was to hear one agenda item presented by Legislative Services. Chairman Adams started the meeting at 3:01pm with all members present except Dennis Johnson. Eric Milstead of Legislative Services Office presented the ask from legislative services to bolster IT services and equipment at the Idaho Statehouse for the coming working groups, organizational session, and beyond. This request would help the legislature stream its committees and meetings through Idaho Public TV to the public by putting additional video cameras in each of the committee rooms – this would be an upgrade from currently only having two committee rooms with video camera capacity. This two work will support public access and engagement in the legislative process while social distancing guidelines are in order. Senator Bair moved to support the request as proposed, seconded by Shawn Keough. Representative Wintrow made an alternate motion that moved to support the request as proposed along with provisions to ensure that the interim work was presented with closed captioning, totaling an extra

$20,000 for the project. Matt Newton seconded the alternate motion. The alternate motion was voted on first and passed unanimously.

B.

CONGRESS ABROGATED STATE IMMUNITY IN TITLE II OF THE AMERICANS

WITH DISABILITIES ACT

Title II of the Americans With Disability Act (hereinafter "ADA") is subject to the definitions found in 42 U.S.C. § 12132 which define "Public Entity" and a "Qualified Individual with a Disability" as follows:

"(1) PUBLIC ENTITY. The term "public entity" means—

(A) any State or local government;
(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and
(C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 24102(4) of title 49).
(2) QUALIFIED INDIVIDUAL WITH A DISABILITY. The term "qualified individual with a disability" means an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

Initially, Plaintiffs note that Speaker Bedke and President Pro Tem Winder have described the legislature as a "department" of the State of Idaho in recent legislation. (*Complaint for Declaratory Judgment filed June 21, 2019 in Representative Scott Bedke et al v Ellsworth CV01-19-11415 (Ada County District Court).* (**Exhibit 1** Attached to this Complaint. This case dealt with a claim by the Legislature that it had control over offices that the State Treasurer occupies.

With regard to these definitions, the Eleventh Circuit has said that this "broad definition is enough to apply to the legislative branch of a state government with regard to compelling the

legislature to provide deaf communication facilities for those members of the public with

disabilities." *Nat'l Ass'n of the Deaf v. State of Florida. et. al.*, 980 F.3d 763 (11th Cir. 2020);

*Reininger v Oklahoma*, 292 F. Supp 3d. 1254 (D.C. Okla. 2017). The Eleventh Circuit provided

a detailed analysis of Title II of the ADA in reaching its conclusion and found that "Title II

plainly expressed Congress's intent to abrogate Eleventh Amendment immunity." *Nat'l Ass'n of

the Deaf*, 980 F.3d at 770.  The Court continued:

> The Supreme Court has held that when enacting legislation to enforce substantive rights guaranteed by the Fourteenth Amendment, Congress may remedy "a somewhat broader swath of conduct, including that which is itself forbidden by the [Fourteenth] Amendment's text." *Kimel*, 528 U.S. at 81, 120 S. Ct. at 644. This type of prophylactic legislation is valid if it exhibits a "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne v. Flores*, 521 U.S. 507, 520, 117 S. Ct. 2157, 2164, 138 L.Ed.2d 624 (1997). This circuit determines whether abrogation was congruent and proportional by applying a three-step test. *Ass'n for Disabled Ams., Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 957 (11th Cir. 2005). First, we identify which right or rights Congress "sought to enforce when it enacted the ADA." Id. Second, we look to "whether there was a history of unconstitutional discrimination to support Congress's determination that prophylactic legislation was necessary." Id. Third, we determine "whether Title II is an appropriate response to this history and pattern of unequal treatment.

The Ninth Circuit has agreed that Title II generally abrogates State immunity in *Phiffer v.

Columbia River Correctional Inst.*, 384 F.3d 791 (9th Cir. 2004):

> Our precedent clearly commands the conclusion that the State is not entitled to Eleventh Amendment immunity under Title II of the ADA. *See, e.g., Dare v. California,* 191 F.3d 1167, 1175 (9th Cir. 1999); *Clark,* 123 F.3d at 1270. And, although the State makes a valiant attempt to persuade us that the Supreme Court's decision in *Board of Trustees of the University of Alabama v. Garrett,* 531 U.S. 356, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), requires us to revisit our precedent, we have already done so and have already rejected the State's claims. *See Hason v. Med. Bd. of Cal.,* 279 F.3d 1167, 1171, *reh'g en banc denied* 294 F.3d 1166 (9th Cir. 2002), *and cert. dismissed* 538 U.S. 958, 123 S.Ct. 1779, 155 L.Ed.2d 508, 2003 WL 1792116 (U.S. April 7, 2003) (No. 02-479); *Thomas v. Nakatani,* 309 F.3d1203,1209 (9th Cir.2002)(stating that *Hason* reaffirmed *Clark's* and *Dare's* holding that Congress abrogated sovereign immunity under Title II); *Lovell v. Chandler,* 303 F.3d 1039, 1050-51 (9th Cir. 2002) (same). We decline further review of our settled precedent.

*Phiffer*, 384 F.3d at 792–93.

The Ninth Circuit reaffirmed this position in *Okwu v. McKIM* 682 F.3d 841 (9th Cir.

2012). The case discusses Title I and Title II and concludes:

> But while both titles purport to authorize damages against state governments, only Title II abrogates a state's Eleventh Amendment immunity. *Tennessee v. Lane,* 541 U.S. 509, 533-34, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004); *Bd. of Tr. of the Univ. Of Ala. v. Garrett,* 531 U.S. 356, 360, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); *Phiffer v. Columbia River Corr. Inst.,* 384 F.3d 791, 792-93 (9th Cir.2004).

*Okwu*, 682 F.3d at 845.

## C.

## EX PARTE YOUNG ALSO APPLIES

Plaintiffs are asking primarily for injunctive relief. Thus Idaho state immunity is not

applicable as this exception to subject matter jurisdiction which is well documented and

discussed in the preceding discussion.

## II

## THE PLAINTIFFS HAVE DISABILITIES COVERED BY THE

## AMERICANS WITH DISABILITIES ACT

Plaintiff Davis has limited lung capacity. Plaintiff Davis has a damaged diaphragm as a

result of a skiing accident and in addition she is a paraplegic person., Plaintiff Chew has diabetes

II and hypertension. Thus, both of them are at high risk of serious injury or even death if they

contract COVID-19. Plaintiffs have located two cases that found that a person with a serious

preexisting health condition has an ADA disability. *Peeples v. Clinical Support Options*

*Inc.*, No. 3:20-cv-30144-KAR, 2020 WL5542719 (D.C. Mass. Sep. 16, 2020) (asthma is a

condition which with Covid 19 can result in serious injury or death); *Silver v. City of Alexandria,*

No. 1:20-CV-00698, 2020 WL 3639696, at *4 (W.D. La. July 6, 2020) (during the COVID-19

pandemic, whether a plaintiff has a disability should be judged by the totality of the

circumstances, including the heightened risks of an impairment caused by the pandemic). *See also Valentine v. Collier*, Civil Action No.4:20-CV-1115, 2020 WL 3625730, at *2 (S.D. Tex. July 2, 2020) (plaintiffs successfully pled a failure to accommodate claim where they identified disabilities that subjected them to a heightened risk of death or serious illness if they contracted COVID-19).

## A.

### DAVIS AND CHEW LUNG CAPACITY

*Peeples* discussed extensively how asthma is a disability and especially how lung conditions can be easily aggravated by Covid-19 such that the disease is serious or deadly:

> As to the first element, Plaintiff is likely to prevail on their contention that their asthma is a disability, at least during the COVID-19 pandemic. The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). In order to determine whether a person is disabled under the ADA, the court must conduct a tripartite analysis. First, plaintiff must prove that he suffers from a physical or mental impairment. Second, the court must evaluate the life activities affected by the impairment to determine if they constitute a "major life activity." Lastly, "tying the two statutory phrases together, [the court] ask[s]whether the impairment substantially limits the activity found to be a major life activity." *Rivera-Mercado v. Scotiabank De Puerto Rico-Int'l*, 571 F.Supp.2d 279, 294 (D.P.R. 2008)(citations omitted). Plaintiff's moderate asthma, as described in the complaint, qualifies as an impairment. *See Lima v. Middlesex Sheriff's Ofc.*, CIVIL ACTION NO. 19-11372-RGS, 2020 WL823088, at *5 (D. Mass. Feb. 19, 2020). "Unobstructed breathing" qualifies as a major life activity.Id. *See Ramos-Echevarria v. Pichis, Inc.*, 659 F.3d 182, 187 (1st Cir. 2011) ("Major life activitie sare basic activities of daily life that an average person in the general population can perform with little or no difficulty – 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'") (quoting 29 C.F.R. § 1630.2(i)(1991)). "Whether a plaintiff with asthma is substantially limited in his ability to work or to breathe is a fact specific question." *Murtha v. N.Y.State Gaming Comm'n*, No. 17 Civ. 10040 (NSR), 2019 WL 4450687, at *10 (S.D.N.Y. Sept. 17, 2019) (citing *Burke v. Niagara Mohawk Power Corp.*, 142 Fed. Appx. 527, 529 (2d Cir. 2005) (noting that "asthma does not invariably impair a major life activity")).

*Peeples*, 2020 WL5542719 at *3.

In this case, Plaintiff Davis' impairment is worse than asthma. Her breathing can be severely compromised by Covid-19 because of her condition. This is how she describes her condition in her Affidavit:

> "Coughing for me is a challenging feat. Since I don't have the abdominal muscles to help me expel mucus from my lungs, I must sit up and lean forward to compress my chest and abdominal cavity to get the force to cough. I am completely unable to cough lying down and therefore, when sleeping if I have to cough, I have to sit up and compress my abdominal cavity to have the pressure to force a cough. It is because of these reasons that I am at a much greater risk of developing a respiratory illness that could become life threatening or even fatal."

*Affidavit of Muffy Davis*

Plaintiff Davis has also included a January 5, 2021 letter from her doctor Jonathan D. Myers who describes how life threatening Plaintiff Davis condition is.

## B.

## PLAINTIFF CHEW'S DIABETES

Plaintiff Chew's diabetes is Type II. She does not claim this is presently a disabling condition, even if it legally is. That is not why she has filed this lawsuit. She can do her job, however, she does claim that, combined with Covid-19, the condition arises to the level of a disability requiring a reasonable accommodation. The United States District Court for the District of Idaho has discussed Type I and Type II diabetes in *Davenport v. State of Idaho Department of Environmental Quality*, 469 F. Supp. 2d 861 (D. Idaho 2006). The discussion of Type II begins at page 874 and examined whether the Plaintiff in a Seventh Circuit case had suffered a major limitation in the major activity of eating and other activities. It mentioned that the plaintiff did not have severe hypoglycemia, seizures or loss of consciousness. "This suggests that his diabetes had not yet worsened to such a stage where it severely restricted his major life activities…." *Id*. at 875. However, Judge Boyle then carefully considered the eating restrictions

that Plaintiff Davenport has and the Seventh Circuit case of *Branham v. Snow*, 392 F.3d 896 (7th Cir. 2004), which considered the Type II diabetes claim. Judge Boyle concluded that there was a question of fact as to whether the eating restrictions Plaintiff Davenport has are sufficient enough to limit his ability to engage in the major life activity of eating. Judge Boyle said that in general:

> The Ninth Circuit has likewise emphasized that, in engaging in the fact-intensive individualized inquiry of whether an impairment is substantially limiting, the issue is whether the *particular impairment* that a plaintiff claims is disabling substantially limits a major life activity. *See Fraser,* 342 F.3d at 1038 (holding that in analyzing whether a person's impairment is substantially limiting, courts must consider "the nature and severity of *the* final impairment, the duration or expected duration of *the* impairment, as well as the permanent or long term impact of *the* impairment.") *Fraser,* 342 F.3d at 1038 (citations omitted) (emphasis added). In this case, there has not been even so much as a suggestion that Plaintiff's alleged limitations on his ability to engage in the major life activity of eating are due to anything other than his diabetic condition. While the purpose of Scheerer's limitations was not to control his blood sugar levels, that is exactly the purpose of Plaintiff's limitations. Accordingly, *Scheerer* does not lead the Court to conclude that Plaintiff is not disabled within the meaning of the ADA.

Judge Boyle in *Davenport* then examined another Seventh Circuit case and said the following regarding Plaintiff Davenport:

> [Plaintiff] has never experienced a severe reaction to his diabetic treatment but is still restricted as to the manner in which he can eat as compared to the average person in the general population; must monitor his blood-sugar levels several times a day; must monitor his food intake carefully including what and when he eats; and, even after the mitigating measures of his treatment regimen, he is never free to eat whatever he pleases because he risks significant bodily reactions if he disregards his blood sugar readings."

> *Davenport*, 469 F. Supp 2d at 876.

Judge Boyle concluded that Plaintiff Davenport had enough evidence to merit a trial on this part of a disability claim.

However, the point in Plaintiff Chew's case is that if eating restrictions are a disability under the ADA, then almost certainly when combined with the threat of Covid-

19 together they become almost certainly a disability.

## III

## PLAINTIFFS SOUGHT A REASONABLE ACCOMMODATION

Attached to Plaintiff Davis' affidavit are three times that she in email writing sought reasonable accommodations. However, there was no response. Plaintiff Chew likewise delivered a written request in August which was not responded to. (Affidavit of Susan Chew). Representative and Minority Leader Ilana Rubel made requests too as detailed in her affidavit. (Affidavit Rubel). Both Plaintiff Chew and Davis made requests on December 30. (Affidavit Chew – attachment) (Affidavit Davis – attachment). In addition, both make their office location concerns know. This raises the question of duties of the administrator under the Rehabilitation Act and Title II to investigate and evaluate Plaintiffs claims.

It is clear that under Title I an employer must do so.

" Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001) (citing *Barnett v. U.S. Air*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), *vacated on other grounds*, 535 U.S. 391, 122 S.Ct. 1516, 152 L.Ed.2d 589 ( (2002)); *see also* 29 C.F.R. § 1630.2(o)(3) (explaining that the interactive process " should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations" ). Defendant's duty to engage in the interactive process includes not only a discussion of Plaintiff's requested accommodation, but also a continuing discussion to explore available alternatives when the requested accommodation is ineffective or too burdensome. *See Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) (citing *Barnett*, 228 F.3d at 1115); *see also Humphrey*, 239 F.3d at 1138; *Gidge v. Yakima Cnty.*, 2010 WL 4641711, at *8 (E.D. Wash. Nov. 8, 2010) ( " The burden of identifying a potentially reasonable accommodation is not placed solely on the employee; rather, the interactive process is the means by which it is determined whether a reasonable accommodation exists." ) (citing *Barnett*, 228 F.3d at 1113).

An employer who fails in good faith to engage in an interactive process is liable under the ADA " if a reasonable accommodation without undue hardship to the employer would **otherwise** have been possible." *Humphrey*, 239 F.3d at 1139. And, an employer who fails to engage in an interactive process in good faith is not entitled to summary judgment unless " a reasonable finder of fact *must* conclude that 'there would in any event have been no reasonable accommodation available.'" *Dark*, 451 F.3d at 1088 (quoting *Morton v. United Parcel Serv., Inc.*, **272 F.3d 1249**, 1256 (9th Cir. 2001),"

But what about the Title II and the Rehabilitation Act? The Second Circuit in

*Wright v New York State Department of Corrections and Community Supervision*

*831 F.3d 64 (2nd Cir. 2016)* has considered this question in regard to Title II:

The Supreme Court has held that Title III of the ADA requires that " an individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances...." *PGA Tour, Inc. v. Martin*, **532 U.S. 661**, 688, **121 S.Ct. 1879**, 149 L.Ed.2d 904 (2001). This is so because the " refusal to consider [an individual' s] personal circumstances in deciding whether to accommodate his disability runs counter to the clear language and purpose of the ADA." *Id.* Although *Martin* was decided in the context of Title III of the ADA, we conclude that the individualized inquiry requirement is applicable to failure to accommodate actions under Title II of the ADA as well. " [T]he ADA was enacted to eliminate discrimination against ' *individuals'* with disabilities." *Id.* (emphasis added). The ADA's legislative history, furthermore, makes evident that the ADA requires public entities to engage in an individualized inquiry before denying a disabled individual's proposed accommodation. The House Committee on Education and Labor's report on the ADA, states that, under Title III, public accommodations " are required to make decisions based on facts applicable to individuals." H.R. Rep. No. 101-485, pt. 2, at 102. Similarly, the Committee, in outlining the " [s]pecific forms of discrimination prohibited" under Title I, explained that employers " are required to make employment decisions based on facts applicable to individual applicants or employees, and not on the basis of presumptions as to what a class of individuals with disabilities can or cannot do." *Id.* at 58. In examining Title II, the Committee strongly suggested that the individualized inquiry requirements of Title I and III also apply to Title II, stating " that the forms of discrimination prohibited by [Title II are] identical to those set out in the applicable provisions of titles I and III of this legislation." *Id.* at 84.

Since Martin, a number of courts have held that Title II requires public entities to engage in an individualized inquiry when determining whether an accommodation is reasonable. *See Starego v. New Jersey State Interscholastic Athletic Ass'n*, **970 F.Supp.2d 303**, 309 (D. N.J. 2013) (" While Martin's analysis concerned Title III

of the ADA, its import, at least as to the individualized inquiry aspect of that decision, applies with equal force to Title II." ); *Cruz ex rel. Cruz v. Pa. Interscholastic Athletic Ass'n, Inc.*, **157 F.Supp.2d 485**, 498-99 (E.D. Pa. 2001) (" [I]n Martin, the Supreme Court made clear that a basic requirement of the ADA is the evaluation of a disabled person on an individual basis." ); *cf . Kapche v. City of San Antonio*, **304 F.3d 493**, 499 (5th Cir. 2002) (noting, in a Title I case, that " intervening Supreme Court cases consistently point to an individualized assessment mandated by the ADA under various sections of the Act." ). More specifically, courts have applied an individualized inquiry requirement in the prison context. *See Pierce v. District of Columbia*, 128 F.Supp.3d 250, 254 (D.D.C. 2015) (finding that state denied a deaf prison inmate "meaningful access to prison services" where prison employees " did *nothing* to evaluate [plaintiff' s] need for accommodation" and did not " engage in any meaningful assessment of his needs" ).

"While these cases are not binding on this Court we find the reasoning underlying these decisions to be persuasive. Requiring an individualized inquiry under Title II is also consistent with Title II's implementing regulations, which guide us " [i]n interpreting the statutory terms" of the ADA. *Henrietta D.*, 331 F.3d at 273-74. For example, a public entity need not allow an " individual to participate in or benefit from the services, programs, or activities of that public entity" if it concludes, after " an individualized assessment," that the individual " poses a direct threat to the health or safety of others." 28 C.F.R. § 35.139. Similarly, " [a] public entity may impose legitimate safety requirements necessary for the safe operation of its services, programs, or activities[; h]owever, [it] must ensure that its safety requirements are based on *actual risks, not on mere speculation, stereotypes, or generalizations about individuals with disabilities .*" 28 C.F.R. § 35.130(h)(emphasis added).

"Title II of the ADA, therefore, requires that once a disabled prisoner requests a non-frivolous accommodation, the accommodation should not be denied without an individualized inquiry into its reasonableness. Here, the record is clear that DOCCS has engaged in no such assessment. Instead, when denying Wright's request to use his motorized wheelchair, DOCCS relied on general safety and administrative concerns unconnected to Wright's specific situation"

In Plaintiffs case there is no evidence that their concerns were ever addressed except for the appearance of plexiglass, which would benefit any legislator. However, only 12 members are using it. That is a good step, but there was no individualized analysis or review of Plaintiffs situation, which is different and so much more serious. Attached hereto as **Exhibit 2** is a copy

of the "Additional Safety Precautions for 2021" that were delivered at the Organizational Session.

IV

**THE REQUESTED ACCOMMODATION IS REASONABLE**

The accommodation of remote participation is reasonable for most or our neighboring state legislators. **(Exhibit 3).** Oregon is apparently meeting in person, but they have taken strong steps to be safe. First, the public is not allowed in the Capitol. Second legislators are distanced and apparently don't mingle. Masks appear to be required. The Legislature did use remote participation for members and the public during the summer and early fall for committees and working groups. (Affidavit Chew P 6).

The evidence in this record show that this a reasonable approach for both Plaintiffs and absolutely necessary for Plaintiff Davis. The Affidavits of all five Representatives detail how congested the House Floor is; how members and the public do not use masks or other protocol; how congested the office area is for them; and how the Capitol has no control over who enters and exits. In addition, the immediate past history shows that only very minimal steps, if any, are taken to control unruly crowds which is a special threat to Plaintiff Davis because of mobility issues.

Regulations pursuant to the Act at 28 CFR 35.130 (b)(7) are helpful in providing guidance:

> "(7) **(i)** A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

...............................

**(8)** A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary to the provision of the service, program, or activity being offered."

Dated this 5th day of January, 2021

By_____/s/John Gannon_____

JOHN GANNON

William G. Myers III (ISB #5598)
B. Newal Squyres (ISB #1621)
Christopher C. McCurdy (ISB #8552)
HOLLAND & HART LLP
800 W. Main Street, Suite 1750
Boise, ID 83702-5974
Telephone: (208) 342-5000
Facsimile: (208) 343-8869
Emails: wmyers@hollandhart.com
          nsquyres@hollandhart.com
          ccmccurdy@hollandhart.com

Attorneys for Plaintiffs

## IN THE DISTRICT COURT OF THE FOURTH JUDICIAL DISTRICT OF THE

## STATE OF IDAHO, IN AND FOR THE COUNTY OF ADA

| | |
|---|---|
| REPRESENTATIVE SCOTT BEDKE, in his official capacity as SPEAKER OF THE HOUSE OF REPRESENTATIVES, and SENATOR BRENT HILL, in his official capacity as SENATE PRESIDENT PRO TEMPORE, <br><br> Plaintiffs, <br><br> vs. <br><br> JULIE ELLSWORTH, in her official capacity as the IDAHO STATE TREASURER, <br><br> Defendant. | Case No. CV01-19-11415 <br><br> **COMPLAINT FOR DECLARATORY JUDGMENT** |

Speaker of the Idaho House of Representatives Scott Bedke and President Pro Tempore of the Idaho Senate Brent Hill, in their official capacities (collectively "Plaintiffs"), seek a declaratory judgment that Idaho Code § 67-1602(3) provides the "legislative department" with the sole authority to determine the use of space on the first floor of the Idaho State Capitol ("Capitol") and that the Idaho Treasurer's refusal to comply with that authority violates the Treasurer's duty to follow the law.

**COMPLAINT FOR DECLARATORY JUDGMENT - 1**

# I.  INTRODUCTION

1.      Idaho Code § 67-1602 governs the allocation and control of space in the Idaho State Capitol.

2.      The legislative department is granted the specific authority under I.C. § 67-1602(3) to determine the use of space on the first floor of the Capitol.

3.      Pursuant to Article III, § 1 of the Idaho Constitution, the legislative department is composed of the Idaho Senate and House of Representatives.

4.      Based on I.C. § 67-1602(3), the Speaker of the House of Representatives, the President Pro Tempore of the Senate, and other members of the legislative department engaged in discussions and correspondence with the Idaho State Treasurer seeking to use office space currently occupied by the Treasurer's Office on the first floor of the Capitol for the legislative department.

5.      The Idaho State Treasurer refuses to acknowledge the right of the legislative department to determine the control of office space on the first floor of the Capitol and has refused to vacate space identified by the Plaintiffs for the legislative department's use currently occupied by the Treasurer's Office.

6.      Plaintiffs, on behalf of the legislative department, seek to resolve the dispute with the Treasurer, confirm the rights of the legislative department under I.C. § 67-1602(3), and obtain a judicial determination of the respective duties of the parties.

# II.  PARTIES

7.      Plaintiff Representative Scott Bedke ("Speaker") is the Speaker of the Idaho House of Representatives ("House").  The Speaker is authorized to represent the House in this matter pursuant to Article III, section 9 of the Idaho Constitution and the Rules of the Idaho House of Representatives.

8.     Plaintiff Senator Brent Hill ("Pro Tem") is the President Pro Tempore of the Idaho Senate ("Senate"). The Pro Tem is authorized to represent the Senate in this matter pursuant to Article III, § 9 of the Idaho Constitution and the Rules of the Idaho Senate.

9.     Defendant Treasurer Julie Ellsworth, in her official capacity, is the Idaho State Treasurer ("Treasurer").

### III.    JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to I.C. § 10-1201 *et seq.* "to declare rights, status, and other legal relations, whether or not further relief is or could be claimed."

11.     A real controversy exists between the parties as set forth in this Complaint that is appropriate and necessary for resolution by a declaratory judgment.

12.     Venue is proper under I.C. § 5-402 because the office of the Idaho State Treasurer is located in the seat of state government, Boise, Ada County.

### IV.    FACTS AND GENERAL ALLEGATIONS

13.     This dispute has its genesis in the comprehensive effort to refurbish and enlarge the Capitol in 2006 and 2007.

14.     In 2006, the Legislature passed House Concurrent Resolution No. 47, approving the construction of two, 2-level, underground additions on each side of the Capitol. House Resolution No. 47 stated that the expansion was necessary to accommodate needs and to "maintain Idaho's Capitol as a working Capitol into the future."

15.     The underground additions contemplated in 2006 were to provide approximately 100,000 square feet of public hearing rooms and office space for use by the legislative department.

16.     However, the initial budget for Fiscal Year 2008 submitted by then Governor C.L. "Butch" Otter eliminated the contemplated additions.

**COMPLAINT FOR DECLARATORY JUDGMENT - 3**

17.     Governor Otter and legislative leadership negotiated a compromise to proceed with the addition of two, 1-level, underground wings and to reassign the control and use of the first, above-ground, floor of the Capitol from the Executive Branch to the legislative department.

18.     This compromise was implemented by amending I.C. § 67-1602 in 2007. Prior to the amendment, the Governor had the authority to determine the use of space on the first floor of the Capitol. *See* 2007 Idaho Laws Ch. 157 (H.B. 218). The 2007 amendment placed the first floor under the control of the legislative department. I.C. § 67-1602(3).

19.     Idaho Code § 67-1602(3) therefore empowers the legislative department to determine the use of space on the first floor of the Capitol:

> (3) Legislative department. The legislative department shall determine the use of the space on the first, third and fourth floors as well as the basement, which basement shall include the underground atrium wings. . . .

20.     The Statement of Purpose for the 2007 amendments to I.C. § 67-1602 stated in part that "[t]his legislation will provide the necessary authority to proceed with the Capitol renovation and expansion project as approved by the Idaho Capitol Commission. The Capitol Master Plan has been modified to include the restoration of the Capitol, the construction of single-story atrium wings at the east and west ends of the Capitol, and a reconfiguration of space in the Capitol which assigns control of the first floor to the Legislature."

21.     The completed underground additions to the Capitol provided approximately 50,000 square feet of new space for legislative use, half of what was originally planned.

22.     The Treasurer's Office is currently located on the first floor of the Capitol.

23.     The House suffers from a shortage of office and other space that hinders its members' ability to discharge their legislative duties.

COMPLAINT FOR DECLARATORY JUDGMENT - 4

24.     Plaintiffs intend to use space on the first floor of the Capitol currently occupied by the Treasurer's Office to help alleviate this shortage.

25.     The Speaker, Pro Tem, and other members of the legislative department engaged in discussions and correspondence with the Treasurer on the relocation of the Treasurer's Office.

26.     In an effort to avoid this litigation, and without any obligation to do so, the Plaintiffs provided the Treasurer an opportunity to retain the Treasurer's traditional office and office space for certain Treasurer's Office personnel in the Capitol.

27.     The Treasurer refused the Plaintiffs' offer.

28.     The Treasurer steadfastly refuses to accept the legislative department's right to determine its use of the first floor of the Capitol contrary to I.C. § 67-1602(3).

29.     The impasse between the parties is justiciable and requires judicial intervention to resolve this dispute.

## COUNT I
### Declaratory Relief

30.     Plaintiffs re-allege and incorporate by reference as though set fully herein paragraphs 1 through 29.

31.     The legislative department has the right and authority to determine the use of space on the first floor of the Capitol under I.C. § 67-1602(3).

32.     The Treasurer's refusal to accept the legislative department's authority to determine the use of space occupied by the Treasurer on the first floor of the Capitol creates a controversy that will be resolved by a declaratory judgment on the legislative department's rights under I.C. § 67-1602(3).

33.     Plaintiffs are entitled to a declaratory judgment that:

    a.      the legislative department has the sole authority under I.C. § 67-1602(3) to determine the use of space on the first floor of the Capitol;

    b.       the legislative department, pursuant to its authority under I.C. § 67-1602(3), has the right to determine the use of its space currently occupied by the Treasurer on the first floor of the Capitol; and

    c.       the Treasurer must comply with the legislative department's determination of the use of the first floor of the Capitol under I.C. § 67-1602(3).

## V.    ATTORNEY FEES

34.     Plaintiffs re-allege and incorporate by reference as thought set fully herein paragraphs 1 through 33.

35.     Plaintiffs have retained the services of Holland & Hart LLP to advance the rights granted to the legislative department by I.C. § 67-1602(3) and are therefore entitled to an award of attorney fees based on I.C. § 12-121.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests the following relief from this Court:

1.     Declare that the legislative department has the sole authority under I.C. § 67-1602(3) to determine the use of space on the first floor of the Capitol.

2.     Declare that the legislative department, pursuant to its authority under I.C. § 67-1602(3), has the right to determine the use of its space currently occupied by the Treasurer on the first floor of the Capitol.

3.     Declare that the Treasurer must comply with the legislative department's determination of the use of the first floor of the Capitol under I.C. § 67-1602(3).

4.     Award Plaintiffs reasonable attorney fees and costs based on I.C. § 12-121 or other applicable authorities.

5.     Award such other and further relief as the Court deems equitable and just.

DATED June 21, 2019.

HOLLAND & HART LLP

By _____

William G. Myers III, of the firm
B. Newal Squyres, of the firm
Christopher C. McCurdy, of the firm

*Attorneys for Plaintiffs*

# Additional Safety Precautions for 2021

We continue to make plans that will help assure the safety and protection of our members, our staff, and all visitors to the Capitol. These plans include:

- All members, staff, and visitors will be encouraged to practice social distancing and to continue washing and sanitizing their hands and office surfaces.
- Masks and hand sanitizer will be readily and widely available. Masks will be strongly encouraged but not required. This may mean that you will be in contact with other members or visitors who choose not to wear a mask.
- Meeting rooms have been configured to accommodate committee members and staff socially distanced a minimum of six feet apart. These rooms are also arranged to allow a smaller number of people to attend committee meetings so distancing can be observed.
- Plexiglas screens will be made available to any member (for his/her floor desk) and to any attaché (for his/her office desk) who requests one. Since these need to be fabricated, we need to know in advance if you want a Plexiglas shield for your office; please let us know your wishes on this point by filling out the form below and returning it to the Speaker's Office.
- We have ordered dual HEPA filter room air purifiers for all offices as well as for larger rooms. These are designed to filter out a high percentage (up to 99.9%) of particles down to 0.1 microns.
- Regular janitorial staff will also be working diligently to make sure all areas are kept as clean as possible during the day and are thoroughly cleaned/sanitized overnight.

Please complete this form and return it to the Speaker's Office no later than 12/3/2020.

NAME: Representative _____

☒ Yes, I would like a Plexiglas shield for my floor desk.

❏ No, I do not want a Plexiglas shield for my floor desk.

SIGNATURE _____     DATE _____

<u>States with remote voting for legislators and States considering renewing remote participation for legislators</u>

<u>Montana</u>

Video of Montana State Joint Rules Committee virtual meeting on Dec. 16, 2020 –

[http://sg001-harmony.sliq.net/00309/Harmony/en/PowerBrowser/PowerBrowserV2/20201216/-1/39213](http://sg001-harmony.sliq.net/00309/Harmony/en/PowerBrowser/PowerBrowserV2/20201216/-1/39213)

Photograph of the Montana State Joint Rules Committee Meeting on Dec. 16, 2020. –



<u>Wyoming</u>

[https://www.jhnewsandguide.com/news/legislature/wyoming-legislature-eyes-spring-for-full-session/article_5835b323-ee60-5aeb-af21-931bda14d272.html](https://www.jhnewsandguide.com/news/legislature/wyoming-legislature-eyes-spring-for-full-session/article_5835b323-ee60-5aeb-af21-931bda14d272.html)

Photograph of Wyoming COVID-19 Special Legislative Session on May 15, 2020 –



Utah

https://le.utah.gov/~2020/bills/sbillenr/SJR016.pdf

Nevada

https://www.nbclosangeles.com/news/coronavirus/covid-19-positive-test-reported-at-nevada-legislature/2394915/

Oregon  No remote voting, but public not allowed in Capitol and protocols in force.

https://www.opb.org/article/2020/12/15/oregon-special-session-covid-19-wildfire-relief/

Washington

https://www.tri-cityherald.com/news/politics-government/article247579955.html

Mississippi

https://www.wjtv.com/health/coronavirus/face-masks-will-be-required-for-2021-mississippi-legislative-session/

Alabama

https://www.montgomeryadvertiser.com/story/news/2020/12/08/alabama-house-of-representatives-trying-make-session-safe-covid/6488660002/

President Trump's Declaration of a COVID-19 Pandemic National Emergency –
https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/